# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-20-00124-CR

---

**Dana Francis Walcott, Jr., Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 264TH DISTRICT COURT OF BELL COUNTY
### NO. 79769, THE HONORABLE PAUL L. LEPAK, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Dana Francis Walcott of the offense of capital murder. *See* Tex. Penal Code § 19.03(a)(2). The district court rendered judgment on the verdict and sentenced Walcott to life imprisonment. In two issues on appeal, Walcott asserts that the district court abused its discretion by admitting evidence of Walcott's gang membership and by excluding a Facebook message, purportedly written by a witness for the State, in which the witness accepted responsibility for the murder. We will affirm the judgment of conviction.

## BACKGROUND

The State charged Walcott, individually and as a party, with intentionally causing the death of Michael Vanlandingham by shooting Vanlandingham with a firearm in the course of kidnapping him. At trial, the jury heard evidence that on September 17, 2018, Killeen police

officers arrested Geniva Madrid, a suspected drug dealer. One of the arresting officers testified that during her arrest, Madrid "made comments that somebody had snitched on her." The suspected "snitch" was Vanlandingham (the victim).

Later that night, Walcott and another man, Tommy Free, kidnapped the victim at a motel in Killeen and transported him first to a residence in Harker Heights, where they met with Free's girlfriend, Danielle Turbeville, and later to a twenty-acre piece of property that witnesses called "the compound." Turbeville, who testified at trial, did not accompany Free and Walcott to the compound but drove there later that morning. On her way there, she noticed that the car that Free and Walcott were driving had been abandoned near the property. Turbeville called Free, who told her that they had "already walked down to the compound." Turbeville then drove onto the property and met a man who lived there, Mark McDaniel, who told her where to find Free and Walcott. As she drove farther into the compound, Turbeville saw Free running toward her. Free got into Turbeville's truck, and she continued driving. Along the way, Turbeville noticed "items of clothing" that were strewn along the ground. Free told her that the clothing belonged to the victim.

Turbeville testified that when they arrived at the victim's location, she noticed that he was completely naked, on his knees and with his hands bound, and Walcott was standing next to him. The victim kept screaming, "I'm sorry, I'm sorry, I'm sorry," and "I'm not a snitch," while Walcott kept yelling at him to "shut up, shut up." Free and Walcott began hitting the victim with nearby objects, including fence panels, tree limbs, and a hatchet that they threw at the victim "several times," "[l]ike a baseball pitcher throws a baseball."

Eventually, Free stopped hitting the victim to smoke methamphetamine with Turbeville, who asked Free, "What's the end result here?" Free responded, "He's going to die."

2

The victim began to "scream louder," which prompted Walcott to pull a gun from his pants and tell him, "Michael, shut up. You're going to make me shoot you." At that point, Turbeville turned around and began walking back to her truck. As she did so, she heard a gunshot and "kept walking." She then heard another gunshot, turned around, and saw Walcott walking toward her with "with the gun in his hand, but he was cocking the gun at that moment." Meanwhile, the victim was still alive and attempting to run away, with Free chasing him with the hatchet. Walcott remarked to Turbeville, "He's a tough son of a bitch." Turbeville resumed walking back to her truck, heard the victim beg for his life, and then heard another gunshot.

As Turbeville reached her truck, she noticed smoke and flames and realized that someone had started a fire. She turned around and saw Free, Walcott, and McDaniel, who had just arrived, facing the flames. Free then ran to Turbeville's truck, telling her that there was a burn ban in effect and that they needed to find a fire extinguisher. They were unable to find one, and the fire continued to burn. One of the men told Turbeville, "It's too big. It's too big. Turn around. Let's get the fuck out of here." Turbeville, Free, Walcott, and McDaniel then fled the compound in Turbeville's truck and drove to a motel, where they met with other people who had knowledge of the kidnapping. Approximately twenty to thirty minutes later, the others told Turbeville and McDaniel that they were free to leave, and they departed the motel together. Turbeville later left town, fearing that she would share the victim's fate if she remained.

McDaniel also testified at trial. McDaniel testified that on the day of the murder, Free had awakened him at the compound and told him that the victim had "snitched" on Madrid. Free explained to McDaniel that he and Walcott were going to take the victim to the back of the property and "talk" to him, which McDaniel understood meant that they were going to kill him. McDaniel did not go with them because the matter was "none of [his] business." When

3

Turbeville arrived later at the compound to "check on the boys," he directed her to the back of the property. At some point thereafter, McDaniel heard a gunshot and went out to where the others were. When he arrived, he saw Walcott "wiping off his gun" and Free lighting a fire. McDaniel told them, "What the fuck? There's a burn ban. I just got popped. I just got a ticket." The men then tried to extinguish the fire but were unable to do so. McDaniel explained that they left the property in Turbeville's truck and went to a motel where other people were waiting for them. Free told the others that "it was done."

Later that morning, after McDaniel returned to the compound, he talked to another person who lived there and told her what had happened. That person arranged for McDaniel to talk to a police detective, and he did so. The detective, who had earlier received a report of a fire at the compound, went out to the property and followed the trail of the victim's discarded clothing to a burn pit, where he discovered a "burned human corpse" that was later identified as the victim's body. A medical examiner performed an autopsy on the body, and the cause of death was determined to be gunshots to the head.

Approximately one week later, police apprehended Walcott inside a vehicle in which he was the passenger. On the passenger-side floorboard of the vehicle, officers found a backpack that contained a firearm. Ballistics testing performed on the firearm confirmed that it was the same weapon that expelled a shell casing found at the crime scene and fired two bullet fragments recovered from the victim's body.

Walcott testified in his defense. He claimed that on the night of the kidnapping, he had accompanied Free to the motel for the sole purpose of obtaining methamphetamine. When they entered the motel room where Walcott intended to purchase the drugs, he observed several individuals questioning and "roughing up" the victim to determine if he had "snitched"

4

on Madrid. After the questioning, Free told the victim, "[Y]ou're coming with us," and the victim "didn't put up a whole lot of fight at that point." When they got into their vehicle, Walcott noticed for the first time that the victim's hands were zip-tied and that Free had a firearm. Free was driving the vehicle, Walcott was sitting in the front passenger seat, and the victim was in the backseat with his hands bound. Walcott claimed that he "didn't know what to expect at that point."

During the drive, they encountered problems with the vehicle, and as they neared the compound, the car "stopped running completely." Walcott testified that Free "brandished" the firearm at them in a threatening manner and instructed them to walk to the compound. Walcott also claimed that Free was responsible for everything that happened to the victim—Free forced him to strip, hit him with the fence panels and tree limbs, struck him with the hatchet, shot him, and burned his body. According to Walcott, he had tried to stop Free from hitting the victim, but "once he pulled the gun and shot him, there wasn't anything I could do." Walcott denied Turbeville's and McDaniel's claims that he held the firearm and wiped it clean after the victim had been shot. When asked to explain the murder weapon's being found in his possession upon his arrest, Walcott claimed that he and Free had stayed at a friend's house following the murder and that Free had left the house for several days to smoke methamphetamine, leaving the firearm at the house. Walcott had also left the house but later returned to pick up some of his belongings. When Walcott returned, he found the firearm, "grabbed it," and kept it in his backpack. He claimed that before he was arrested, he intended to turn over the firearm to the police.

After hearing the evidence, the jury found Walcott guilty of capital murder as charged. This appeal followed.

5

## STANDARD OF REVIEW

"Trial court decisions to admit or exclude evidence will not be reversed absent an abuse of discretion." *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018). "Under this standard, the trial court's decision to admit or exclude evidence will be upheld as long as it was within the 'zone of reasonable disagreement.'" *Id.* (quoting *McGee v. State*, 233 S.W.3d 315, 318 (Tex. Crim. App. 2007)). The trial court abuses its discretion in admitting or excluding evidence only "when it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably." *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019) (citing *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)).

## DISCUSSION

### Gang-related evidence

During trial, McDaniel testified that he and Free were members of the Aryan Brotherhood and that Free had told him that Walcott was also a member of the Aryan Brotherhood. McDaniel further testified that he knew that Free and Walcott were going to kill the victim because that is what the Aryan Brotherhood does "to snitches" and that McDaniel was afraid for his life because he had become a "snitch." In his first issue, Walcott asserts that the district court abused its discretion in admitting this evidence because it was irrelevant and more prejudicial than probative. The State argues in response that Walcott failed to preserve error on these grounds and that, even if he had preserved error, the evidence was admissible.

We first address error preservation. Prior to trial, Walcott filed a motion in limine relating to evidence of Walcott's gang membership, and the district court held a hearing on that motion. The primary issue during the hearing was the admissibility of McDaniel's phone call to

6

the police reporting the crime. Walcott argued that statements made during the call, in which McDaniel referenced the Aryan Brotherhood, were inadmissible hearsay. Walcott acknowledged that "from the perspective of motive because they want to elicit that the victim snitched on Geniva [Madrid]," evidence of gang membership "would probably be permissible," but not coming from McDaniel's phone call to the police "because [the police detective] only has it from hearsay." Walcott explained:

> If they want to put Mark McDaniel up there I think that would probably be permissible and we could also—if they want to put Mark McDaniel up there, we could discuss the Aryan Brotherhood stuff a little bit further. But our primary objection [to] Detective Prestin testifying is that it's hearsay.

After further discussion on the matter, the district court stated that based on its understanding of the evidence at that time, which it noted was "pretty limited because we haven't heard any," McDaniel's testimony relating to gang membership "would be admissible" to prove motive. However, Walcott asked the district court "to not yet make that ruling on whether or not in this case gang membership was a motive" until it heard the recording of McDaniel's phone call to the police. The district court then listened to the recording of the call and "sustain[ed] the defense objection to the recordings," but it made no ruling at that time to the admissibility of McDaniel's testimony relating to the Aryan Brotherhood.

During trial, the State asked McDaniel whether he had in the past "become a member of a gang." McDaniel answered, "The Aryan Brotherhood." Walcott did not object to this but allowed the State to ask a follow-up question, "How long have you been a member?" At that point, Walcott objected "to any mention of Aryan Brotherhood based on your order and the

7

ruling," without further explanation.[1]  The district court overruled the objection without comment, and Walcott did not ask for a running objection at that time.

The State asked several more questions of McDaniel related to the Aryan Brotherhood without any objection from Walcott, leading to testimony that as a member of the Aryan Brotherhood, McDaniel knew that Free and Walcott intended to kill the victim; that Free had referred to Walcott as "another Aryan brother"; that McDaniel was worried the Aryan Brotherhood would kill him for reporting the crime to the police; and that the Aryan Brotherhood considered him to be a "snitch."  The State also asked McDaniel if Free had told him that Walcott was "AB."  After McDaniel answered, "Yes," Walcott raised a hearsay objection, which the district court sustained, but Walcott raised no other objection to that testimony.

Walcott did not object to the subject matter again until after McDaniel had finished testifying.  In a hearing outside the presence of the jury following a lunch break, Walcott stated the following:

> I think you covered it with Mr. McDaniel's testimony but we have objected in limine to any testimony regarding Aryan Brotherhood and we objected again when Mr. McDaniel was testifying.  I just want to make it clear that we did object and we do object to that testimony.  I don't want to continue to object if it's just going to continue to be overruled but we object to the testimony about Aryan Brotherhood on the basis that it's not relevant, it's mischaracterizing evidence and that it is unfairly prejudicial under rule 403.

The district court noted that it had "overruled that objection" and inquired as to whether Walcott was asking for a running objection moving forward.  Walcott answered in the affirmative, and

---

[1] Walcott was apparently referring to the district court's statements during the hearing on the motion in limine, but as we have explained, the district court's ruling at that hearing was on the inadmissibility of McDaniel's phone call to the police on hearsay grounds; the district court made no ruling at that time on the admissibility of McDaniel's testimony relating to the Aryan Brotherhood.

the district court granted Walcott a running objection to any further testimony "about Mr. Walcott possibly be[ing] Aryan Brotherhood."

"Under Texas law, 'if, on appeal, a defendant claims the trial judge erred in admitting evidence offered by the State, this error must have been preserved by a proper objection and a ruling on that objection." *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003) (quoting *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991)). "A proper objection is one that is specific and timely." *Id*. (citing *Wilson v. State*, 71 S.W.3d 346, 349–50 (Tex. Crim. App. 2002)). To be timely, "the defense must have objected to the evidence, if possible, before it was actually admitted." *Ethington*, 819 S.W.2d at 858. "Therefore, if a question clearly calls for an objectionable response, a defendant should make an objection before the witness responds." *Dinkins v. State*, 894 S.W.2d 330, 355 (Tex. Crim. App. 1995). "If he fails to object until after an objectionable question has been asked and answered, and he can show no legitimate reason to justify the delay, his objection is untimely and error is waived." *Id*.; *see Luna v. State*, 268 S.W.3d 594, 604 (Tex. Crim. App. 2008).

"Further, with two exceptions, the law in Texas requires a party to continue to object each time inadmissible evidence is offered." *Ethington*, 819 S.W.2d at 858. "The two exceptions require counsel to either (1) obtain a running objection, or (2) request a hearing outside the presence of the jury." *Martinez*, 98 S.W.3d at 193. "When the court hears a party's objections outside the presence of the jury and rules that evidence is admissible, a party need not renew an objection to preserve a claim of error for appeal." Tex. R. Evid. 103(b); *see Ethington*, 819 S.W.2d at 858. However, the party's objections to the evidence must be specific rather than general, *see Martinez*, 98 S.W.3d at 193, and the party must seek "a definitive final ruling on a timely and specific motion to exclude evidence," *Geuder v. State*, 115 S.W.3d 11, 15 (Tex. Crim.

9

App. 2003). "A trial judge's grant or denial of a motion in limine is a preliminary ruling only and normally preserves nothing for appellate review." *Id*. at 14–15.

Here, the record reflects that at the hearing on Walcott's motion in limine, Walcott did not object to the admissibility of McDaniel's testimony relating to the Aryan Brotherhood on the specific relevance grounds that he raises on appeal (and, in fact, he acknowledged that such evidence "would probably be permissible" to show motive). Walcott did not seek nor could he obtain a definitive, final ruling from the district court on the admissibility of McDaniel's testimony at a hearing on a motion in limine. Instead, he indicated that "if [the State] want[s] to put Mark McDaniel up there, we could discuss the Aryan Brotherhood stuff a little bit further," and he asked the district court "to not yet make that ruling on whether or not in this case gang membership was a motive" until it heard the recording of McDaniel's phone call to the police. However, after the district court listened to the call and sustained Walcott's objection to the recording, Walcott failed to obtain any additional ruling on the admissibility of other gang-related evidence at that time. Thus, Walcott failed to preserve error at the hearing as to the admission of such evidence. *See Martinez*, 98 S.W.3d at 193 (concluding that defendant's general objection to gang-related evidence in motion for limine did not preserve error and that defendant's objections to photographs during hearing outside presence of jury preserved error as to those photos but "did not preserve error as to all other evidence of gang affiliation").

As for Walcott's objections during trial, the record reflects that Walcott did not object when the State asked McDaniel if he was "a member of a gang" and McDaniel answered, "The Aryan Brotherhood." Walcott waited to object until after the State asked a follow-up question as to how long McDaniel had been a member of that gang. Moreover, when Walcott

objected, he did so without indicating the specific grounds for his objection, referring only to the district court's "order and ruling," which, as we have explained, was limited to the admissibility of the phone call and did not address the specific grounds for exclusion that Walcott raises on appeal. Also, when the district court overruled Walcott's objection, Walcott failed to obtain a running objection to further evidence relating to the Aryan Brotherhood. As a result, the State elicited additional testimony from McDaniel on that subject matter without objection from Walcott, including that McDaniel, Free, and Walcott were members of that gang, that the Aryan Brotherhood killed "snitches," and that McDaniel was afraid the Aryan Brotherhood would kill him for being a "snitch." It was not until after McDaniel had finished testifying that Walcott specified the grounds for his objection and obtained a running objection to any further testimony related to the Aryan Brotherhood. We conclude that Walcott failed to timely object to this evidence and thus failed to preserve error, if any, in its admission. *See id.*; *Ethington*, 819 S.W.2d at 859; *Rawlins v. State*, 521 S.W.3d 863, 871 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd).

Moreover, even if Walcott had preserved error, we cannot conclude on this record that the district court abused its discretion in admitting the evidence. A defendant's gang membership is generally inadmissible absent evidence placing the defendant's gang membership "in context" by connecting it to the charged offense. *See Dawson v. Delaware*, 503 U.S. 159, 165–68 (1992); *Ex parte Martinez*, 330 S.W.3d 891, 902 (Tex. Crim. App. 2011); *Galvez v. State*, 962 S.W.2d 203, 206 (Tex. App.—Austin 1998, pet. ref'd). Thus, evidence of gang membership is inadmissible standing alone, *see Dawson*, 503 U.S. at 166, but it may be admissible to show motive, intent, bias, or to refute a defensive theory, *see Vasquez v. State*, 67 S.W.3d 229, 239–40 (Tex. Crim. App. 2002); *Medina v. State*, 7 S.W.3d 633, 644–45 (Tex.

11

Crim. App. 1999); *Barrientos v. State*, 539 S.W.3d 482, 492 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *see also* Tex, R. Evid. 401 ("Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action."), 404(b) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character" but "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."); *Ortiz v. State*, 93 S.W.3d 79, 94 (Tex. Crim. App. 2002) ("Gang membership evidence is admissible . . . if it is relevant to show a noncharacter purpose that in turn tends to show the commission of the crime.").

The State's theory of the case was that the victim was murdered because he was suspected of being a "snitch" and the Aryan Brotherhood kills "snitches." Thus, evidence that Walcott was a member of the Aryan Brotherhood would establish a motive for him to kill the victim, and evidence of motive is considered "highly relevant" circumstantial evidence tending to prove the commission of an offense. *See Colone v. State*, 573 S.W.3d 249, 266–67 (Tex. Crim. App. 2019); *see also Lopez v. State*, 200 S.W.3d 246, 251 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd) ("Evidence showing motive to commit murder is a significant circumstance indicating guilt, and it is therefore relevant and admissible."). It would not have been outside the zone of reasonable disagreement for the district court to admit the evidence on that basis. *See Vasquez*, 67 S.W.3d at 240 (evidence of gang membership admissible to show motive for gang-related crime); *Medina*, 7 S.W.3d at 643 (evidence of gang-related activities admissible to explain context in which offense occurred); *Barrientos*, 539 S.W.3d at 494 (evidence of gang membership admissible because it helped explain actions of defendant and co-defendant on night of murder and provided evidence of motive).

It also would not have been outside the zone of reasonable disagreement for the district court to decline to exclude the evidence under Rule 403, which allows for the exclusion of relevant evidence only "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. "The term 'probative value' refers to the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence." *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010). "'Unfair prejudice' refers to a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* "It is only when there exists a clear disparity between the degree of prejudice produced by the offered evidence and its probative value that Rule 403 is applicable." *Id.* "A Rule 403 analysis generally balances the following four factors, though they are not exclusive: (1) how probative the evidence is, (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence." *Colone*, 573 S.W.3d at 266; *see also Gigliobianco v. State*, 210 S.W.3d 637, 642 (Tex. Crim. App. 2006) (explaining factors in more detail and observing that they "may well blend together in practice").

Regarding the probative value of the evidence and the State's need for it, as we have already explained, the evidence showed that Walcott had a motive to kill the victim. More than that, it provided the jury with important contextual information to help it understand the crime. As the State explained in its brief, "[W]ithout evidence that Appellant and his accomplice are members of the Aryan Brotherhood, as well as what that gang does to snitches, this murder is hard to fathom: why would two people, seemingly without provocation, kidnap a person, torture

13

him, and murder him in a horrific fashion?" Additionally, the evidence established the relationship between Walcott and Free, who participated in the kidnapping and killing, and helped to explain why Free and Walcott involved McDaniel, another gang member, who was one of the key witnesses for the State. The evidence further helped to explain why McDaniel was afraid for his life after reporting the crime and helped the jury to evaluate his credibility as a witness. The evidence also tended to refute Walcott's defensive theory that he went to the motel where the victim was kidnapped for the sole purpose of purchasing drugs and that he was unaware of and an unwitting participant in Free's plan to kidnap and kill the victim. In sum, the evidence was highly probative of motive and other critical issues in the case and the State's need for the evidence was significant in that it helped to contextualize the entire crime for the jury. Thus, the first and fourth factors weigh against exclusion.

Regarding the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way, evidence of gang membership is considered "highly inflammatory." *See Barrientos*, 539 S.W.3d at 492; *Galvez*, 962 S.W.2d at 206. Thus, the second factor weighs in favor of exclusion. However, the third factor, the time needed to develop the evidence, weighs against exclusion in this case. The State developed the evidence through the testimony of a single witness, McDaniel, and the questions related to the Aryan Brotherhood did not consume an inordinate amount of time during the trial.

In sum, while the second factor weighs in favor of excluding the evidence, the first, third, and fourth factors weigh against exclusion. On this record, we cannot conclude that the district court abused its discretion in finding that the probative value of the evidence was not "substantially outweighed" by the danger of unfair prejudice. *See Barrientos*, 539 S.W.3d at 494–95; *McCallum v. State*, 311 S.W.3d 9, 15–16 (Tex. App.—San Antonio 2010, no pet.).

14

Because we conclude that Walcott failed to preserve error in the admission of the gang-related evidence and that even if he had preserved error, the district court did not abuse its discretion in admitting it, we overrule Walcott's first issue.

**Facebook message**

In a hearing outside the presence of the jury, the victim's mother testified that in August 2019, she received a Facebook message from someone identifying herself as "Danielle Turveville." In the message, the person asked for forgiveness for "what I've done to your son Michael," stated that she was "fully responsible" for taking his life, claimed to be "the main ringleader for his death," and asserted that she shot the victim. Walcott sought to admit the contents of this message as a "prior inconsistent statement" of Turbeville, *see* Tex. R. Evid. 613(a), but the State objected, arguing that Walcott had failed to authenticate the message and that it was inadmissible for that reason, *see id*. R. 901(a). The district court sustained the State's objection. In his second issue, Walcott asserts that the exclusion of this evidence denied him his constitutional right to present a complete defense at trial. *See Potier v. State*, 68 S.W.3d 657, 659 (Tex. Crim. App. 2002) ("[T]he exclusion of a defendant's evidence can amount to a violation of the right to compel the attendance of witnesses in the defendant's favor."); *Martinez v. State*, 212 S.W.3d 411, 423 (Tex. App.—Austin 2006, pet. ref'd) ("A trial court's ruling excluding evidence may rise to the level of a constitutional violation if the ruling excludes otherwise relevant and reliable evidence which 'forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense.'" (quoting *Wiley v. State*, 74 S.W.3d 399, 405 (Tex. Crim. App. 2002))).

15

The State argues that Walcott forfeited this constitutional ground by not raising the argument at trial. We agree. The constitutional right to present a complete defense is subject to forfeiture by not bringing to the trial court's attention the denial of that right. *See Anderson v. State*, 301 S.W.3d 276, 280 (Tex. Crim. App. 2009); *Carrion v. State*, 488 S.W.3d 925, 928 (Tex. App.—Eastland 2016, pet. ref'd). Here, Walcott responded to the State's authentication objection by arguing that it should be admissible as a prior inconsistent statement under Texas Rule of Evidence 613. He never articulated to the trial court that the exclusion of the evidence would violate his constitutional right to present a complete defense. Accordingly, he has failed to preserve that issue for our review. *See Leza v. State*, 351 S.W.3d 344, 360–61 (Tex. Crim. App. 2011) (concluding that appellant's argument that proffered evidence satisfied exception to hearsay rule did not preserve error regarding denial of right to present complete defense because defendant "never alerted the trial court in any way that exclusion . . . would violate any federal constitutional right"); *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995) (concluding that argument based on evidentiary rule did not preserve error regarding denial of defendant's right to present defense) *see also Cerda v. State*, No. 03-12-00582-CR, 2014 WL 4179359, at *6 (Tex. App.—Austin Aug. 22, 2014, pet. ref'd) (mem. op., not designated for publication) ("Because appellant did not articulate that his right to present a meaningful defense supported the admission of the complained-of excluded evidence . . . the trial court never had the opportunity to rule on this rationale.").

Additionally, even if Walcott had preserved error, we cannot conclude on this record that the district court abused its discretion in excluding the evidence. The constitutional right to present a complete defense "is qualified by the requirement that the evidence be relevant and not excluded by an established evidentiary rule." *Davis v. State*, 313 S.W.3d 317, 329 n.26

(Tex. Crim. App. 2010). "A bedrock condition of admissibility of evidence in any legal contest is its relevance to an issue in the case—that is to say, its tendency to make a fact of consequence to determination of the action more or less probable." *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). "Evidence has no relevance if it is not authentically what its proponent claims it to be." *Id*. "Rule 901(a) of the Rules of Evidence defines authentication as a 'condition precedent' to admissibility of evidence that requires the proponent to make a threshold showing that would be 'sufficient to support a finding that the matter in question is what its proponent claims.'" *Id*. (quoting Tex. R. Evid. 901(a)). "Evidence may be authenticated in a number of ways, including by direct testimony from a witness with personal knowledge, by comparison with other authenticated evidence, or by circumstantial evidence." *Id*.

"In the context of communications, the authentication issue that generally arises is whether the evidence is sufficiently linked to the purported author." *Campbell v. State*, 382 S.W.3d 545, 549 (Tex. App.—Austin 2012, no pet.). "In evaluating whether an electronic communication has been sufficiently linked to the purported author," this Court has "recognize[d] that electronic communications are susceptible to fabrication and manipulation." *Id*. at 549–50. Social networking websites such as Facebook "allow users to establish an online account, create a profile, and then invite others to access that profile as a 'friend.'" *Id*. at 550. "Accordingly, with respect to identity, Facebook presents an authentication concern that is twofold." *Id*. "First, because anyone can establish a fictitious profile under any name, the person viewing the profile has no way of knowing whether the profile is legitimate." *Id*. "Second, because a person may gain access to another person's account by obtaining the user's name and password, the person viewing communications on or from an account profile cannot be certain that the author is in fact the profile owner." *Id*. "Thus, the fact that an electronic

17

communication on its face purports to originate from a certain person's social networking account is generally insufficient standing alone to authenticate that person as the author of the communication." *Id.* Other evidence of authenticity is required, such as internal similarities between the purported message and other verified messages of the author, unique speech and writing patterns used by the purported author, and the inclusion of information that only the purported author would know. *See Tienda*, 358 S.W.3d at 640–45; *Campbell*, 382 S.W.3d at 551–53.

Here, the Facebook message purported to be from "Danielle Turveville," which is not even the correct spelling of Turbeville's last name. In a hearing outside the presence of the jury, Turbeville testified that she had not sent any Facebook message to the victim's mother or any other member of the victim's family and that she had deactivated her Facebook account in late summer or early fall of 2019 after learning from police that her account might have been hacked. Michael Eskelin, a private investigator who had been hired by the defense to assist with the case, testified that the username of Turbeville's Facebook account was "Danielle.Turbeville.9" and that the account was currently active, although he could not determine when it had been activated or who had activated it. The username of the Facebook account that had been associated with the message to the victim's mother was "Danielle.Turveville.7121," and Eskelin had been unable to find any Facebook account containing that username. Thus, he agreed with the prosecutor that he had "no idea" who had created that account. As for the message itself, it contained information describing the crime that would have been known to other people in addition to Turbeville at the time the message was sent, approximately one year after the murder. Moreover, Walcott presented no evidence that the message contained a photograph or other identifying information of Turbeville, any speech or

18

writing patterns that were unique to Turbeville, or that the message was similar in any way to other communication that Turbeville had sent. On this record, we cannot conclude that it was outside the zone of reasonable disagreement for the district court to conclude that Walcott had failed to sufficiently authenticate the Facebook message and to exclude the evidence for that reason. *See Dering v. State*, 465 S.W.3d 668, 672 (Tex. App.—Eastland 2015, no pet.) (concluding that trial court did not err in excluding Facebook posts because "[t]here was no evidence of the authenticity of who the purported author was of any of the Facebook posts").

We overrule Walcott's second issue.

## CONCLUSION

We affirm the district court's judgment of conviction.

_____

Gisela D. Triana, Justice

Before Justices Goodwin, Triana, and Kelly

Affirmed

Filed: May 21, 2021

Do Not Publish

19